Derek Brown
Utah Attorney General
Stanford E. Purser (13440)
Utah Solicitor General
Joshua B. Cutler (16434)
Mark C. Gillespie (19265)
Assistant Solicitors General
Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
Telephone: (801) 366-0533
spurser@agutah.gov
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendants*

---

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF UTAH**

---

| | |
|---|---|
| United States of America and Commodity Futures Trading Commission;<br><br>*Plaintiffs*,<br><br>v.<br><br>State of Utah and Utah Attorney General Derek Brown, in his official capacity,<br><br>*Defendants.* | **Defendants' Surreply in Opposition to Plaintiffs' Motion and Memorandum of Law in Support of a Preliminary Injunction and Temporary Restraining Order**<br><br>No. 2:26-cv-01055-RJS<br><br>Judge Robert J. Shelby |

Pursuant to this Court's scheduling order (Dkt. 17), Defendants Utah Attorney General Derek Brown and the State of Utah (collectively, "the State" or "Utah") file this limited Surreply in Opposition to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order. Dkt. 7.

## Introduction

At the scheduling conference held on November 6, 2026, this Court noted that Plaintiffs the United States of America and the Commodity Futures Trading Commission had not specifically addressed the reasoning in this Court's ruling in *KalshiEx LLC v. Cox*, No. 2:26-CV-00151-RJS-CMR, 2026 WL 2241564 (D. Utah Aug. 4, 2026). The Court requested that Plaintiffs address the reasoning in that ruling as part of their Reply and granted the State leave to file a limited surreply responding to Plaintiffs' arguments as to the Court's *Kalshi* ruling.

In their Reply, Plaintiffs attack this Court's reasoning in *Kalshi* on two fronts. First, Plaintiffs argue that the Court erred in interpreting the CEA at the time it ruled. Second, they argue that various subsequent developments have undermined the Court's reasoning. Both arguments fail.

## Argument

### I. Plaintiffs' Criticisms of the Court's Prior Ruling Are Misplaced.

Plaintiffs argue that the Court's interpretation of the CEA "was incorrect at the time." Dkt. 23 at 2. But Plaintiffs merely repeat the same flawed arguments KalshiEx LLC already raised before the Court.

**A. Section 2(a)(1)(A).**

First, Plaintiffs take aim at this Court's reading of the savings clause in Section 2(a)(1)(A). As the Court noted in its prior ruling, "[o]n its face," the language of the savings clause "strongly signals there is room for State regulation as it relates to the province of the CEA." *KalshiEX*, 2026 WL 2241564, at *7. Plaintiffs concede that the Court "was correct" on this point. Dkt. 23 at 4. But Plaintiffs then claim that "the savings clause does not reach swap transactions on DCMs." *Id*. Yet, like Kalshi, Plaintiffs fail to provide an alternative reading of Section 2(a)(1)(A) that gives meaning to both the exclusive-jurisdiction provision and the savings clause.

By its terms, the exclusive-jurisdiction provision applies only to swaps traded on DCMs. So it would deprive the savings clause of all meaning to interpret it as "not reach[ing] swap transactions on DCMs," as Plaintiffs contend. Indeed, under Plaintiffs' reading, the savings clause does not actually *save* anything from preemption.

In contrast, this Court's reading, which is consistent with the interpretations offered by the State and the Sixth and Ninth Circuits in their recent decisions[1] and the rest of the CEA,[2] would give meaning to both provisions. *See infra* at 6. On this

---

[1] On November 18, 2026, the Fourth Circuit joined the Sixth and Ninth Circuits in rejecting prediction-market preemption claims. *See KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Nov. 18, 2026).

[2] In two separate paragraphs in this Court's *Kalshi* decision, the Court discussed Section 5 of the CEA, which identifies the CEA's purposes. *KalshiEX*, 2026 WL 2241564, at *2, 13. Although a correct understanding of the CEA's scope is essential to interpreting Section 2(a)(1)(A) and the other provisions Plaintiffs identify, Plaintiffs ignore Section 5 and the Court's discussion of it.

reading, the savings clause ensures that States remain free to regulate what the CFTC does not—such as gambling. Indeed, that is the very purpose of the clause.

**B. Section 16(e)(2).**

Second, Plaintiffs criticize this Court's reading of Section 16(e)(2). The Court explained that Section 16(e)(2) provides that "the CEA preempts only State gaming laws that govern certain swaps that occur off DCMs and other designated swaps not applicable here." *KalshiEx*, 2026 WL 2241564, at *3. Based on this correct reading, the Court concluded (as have most courts) that "Section 16(e)(2) makes clear that Congress intended States to have the power to regulate its swaps involving gaming except in certain specified situations." *Id.* at 13. The Court's reading is correct and harmonizes with the reading of Section 2(a)(1)(A) advocated by the State and most courts: Section 2(a)(1)(A) preempts State law, but only where that law would usurp the CFTC's regulatory functions; in contrast, Section 16(e)(2) specifically preempts State *gambling* laws in certain, inapplicable situations regardless of whether those gambling laws usurp the CFTC's regulatory role.

Plaintiffs don't identify any error in the Court's interpretation of what Section 16(e)(2) does. Instead, they argue only that the Court erred in interpreting how Section 16(e)(2) fits in with the rest of the CEA. Dkt. 23 at 5. Specifically, Plaintiffs argue that Section 16(e)(2) "serves as a backstop to [Section 2(a)(1)'s] more comprehensive preemptive scope." *Id.* So Plaintiffs' reading of Section 16(e)(2) makes sense only if the Court also adopts Plaintiffs' reading of Section 2(a)(1)(A).

Plaintiffs' argument also again fails to grapple with the differing regulatory aims of the CFTC and other agencies (including State agencies) that Section

2(a)(1)(A) expressly saves from preemption. Plaintiffs argue that "it makes little sense to say that" the "CEA preempts state gambling laws *only* as applied to transactions over which the [CFTC] exercises minimal oversight." Dkt. 23 at 5-6 (emphasis in original). But this would be unreasonable only if the CEA and State gambling laws shared the same regulatory purpose. They clearly do not.

Plaintiffs' confusion on this point also appears to infect their understanding of how the exclusive-jurisdiction provision in Section 2(a)(1)(A) and Section 16(e)(2) function. Indeed, these provisions serve entirely different purposes. As discussed above, the exclusive-jurisdiction provision prevents other agencies from usurping the CFTC's statutory functions as to on-DCM swaps, nothing more. And, because Congress determined that it did not want State gambling laws *or the CEA* to interfere with specific types of transactions (such as "transactions in foreign currency and government securities, hybrid instruments, or banking products" or transactions exempted from the CEA for "public interest" reasons), Congress excluded or exempted those transactions from the scope of the CEA and expressly preempted State gambling laws as to those specific transactions, thereby leaving those transactions to the free market or other federal regulations. *KalshiEx*, 2026 WL 2241564, at *3. With this understanding, there is nothing absurd about Congress's judgment that *on-DCM* trading should proceed under the CFTC's regulation while also subject to generally applicable state laws, particularly since that is what the CEA actually says.

In sum, Section 16(e)(2) stands in stark contrast to Section 2(a)(1)(A), which lacks express preemption language and includes a savings clause. Section 16(e)(2)'s limited preemption in carefully defined situations thus cannot be read to imply more sweeping preemption elsewhere.

**C. Section 7a-2**

Third, Plaintiffs challenge the Court's reading of the Special Rule in Section 7a-2. Plaintiffs argue that the Special Rule "does not allow state law to determine whether event contracts are lawful; rather it allows the [CFTC] to prohibit event contracts when the underlying event violates state law." Dkt. 23 at 7. But Plaintiffs again fail to understand what the State is attempting to do. As the State explained in its Opposition, Utah is not attempting to regulate "event contracts" *as event contracts* nor is it attempting to ban "event contracts" from trading nationwide on CFTC-approved exchanges. Dkt. 19 at 19. Instead, Utah is seeking to stop Kalshi from offering "illegal wagers" within the State because they are illegal under Utah's gambling laws. *Id.* Whether these illegal wagers may or may not constitute "event contracts" or "swaps" under the CEA is just as irrelevant to Utah's gambling analysis as their treatment under any other regulatory framework. *Id.* And, as the Court (and other courts) correctly recognized, "Congress' enactment of the Special Rule . . . demonstrates" that Utah's regulation of other matters like gambling "should operate in tandem with the CEA." *KalshiEx*, 2026 WL 2241564, at *8 (quoting *Williams*, 2026 WL 2017466, at *7).

In sum, Plaintiffs fail to identify any errors in the Court's interpretation of the CEA.

## II. No Subsequent Developments Have Undermined this Court's Reasoning.

Next, Plaintiffs identify four categories of "intervening developments" that have allegedly "further clarified the CEA's preemptive effect." Dkt. 23 at 7. But the identified "developments" actually support this Court's *Kalshi* ruling or have no effect on the legal landscape underlying this Court's reasoning.

### A. Subsequent Court Decisions.

First, Plaintiffs argue that subsequent decisions by the Sixth and Ninth Circuits have "join[ed] the other three circuits to have considered the issue." Dkt. 23 at 7. But, with the exception of the Third Circuit's ruling in *Flaherty* (a ruling the Court was aware of when it issued its ruling), the cited cases are wholly consistent with this Court's *Kalshi* ruling.

In *Kalshi*, the Court concluded that "the CEA provides for some State regulation" and that "the CEA explicitly provides for State jurisdiction" over matters that also happen to fall within the CFTC's purview. *KalshiEx*, 2026 WL 2241564, at *13. This Court's reasoning closely agrees with the reasoning of the Sixth Circuit, which concluded that the CEA only impliedly "displaces direct enforcement and regulatory authority pertaining to the licensing and operation of DCMs," not "ancillary regulations that only incidentally burden DCMs." *Schuler*, 2026 WL 2884087 at *21.

The Court's ruling is also consistent with the Ninth Circuit's treatment of the issue. Although one Ninth Circuit panel in *Assad* concluded that the CEA expressly preempts some State regulation of swaps, the court's express-preemption analysis was less than one page, irrelevant dicta, and ambiguous as to which State laws "regulate[] swaps." *Assad*, 190 F.4th at 1109. The *Assad* court's express-preemption analysis must also be read together with its field-preemption analysis later in the opinion. There the *Assad* court clarified that although "the CEA preempts the field of regulating swaps traded on a DCM," *id.* at 1122 (citing § 2(a)(1)(A)); the CEA would not preempt "the Nevada state [gambling] laws and regulations at issue" because "gambling" is "a field which the CEA has not preempted." *Id.* at 1122. So the *Assad* court clearly did not interpret the CEA to expressly or impliedly preempt State gambling laws or enforcement efforts. And this reading of the *Assad* opinion was confirmed just a few weeks later in another Ninth Circuit opinion that concluded that the "phrase 'exclusive jurisdiction' is not a broad grant to the [CFTC] of control over all commodities-related matters to the exclusion of all" other laws. *Blue Lake Rancheria v. Kalshi, Inc.*, 191 F.4th 1071, 1089 (9th Cir. Sept. 16, 2026).

Finally, the Court's *Kalshi* ruling is also consistent with the older circuit cases that have dealt with the preemption question in the context of the CEA. *See* Dkt. 19 at 14.

**B. Subsequent Regulatory Actions.**

Second, Plaintiffs argue that the Court should re-think its reading of the CEA in light of subsequent CFTC rulemaking and a non-binding "guidance" the CFTC

published interpreting its impartial-access regulation. Dkt. 23 at 7-8. But neither set of regulatory actions have any legal effect on this Court's reasoning.

To start, Plaintiffs vastly overstate the CFTC's authority and, consequently, the legal effect of the CFTC's recent actions taken in the midst of litigation nationwide. As a regulatory agency, the CFTC does not enjoy "the power to make law, for no such power can be delegated by Congress." *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936). Instead, the CFTC has only the "power to adopt regulations to carry into effect the will of Congress *as expressed by the statute*." *Id.* (emphasis added). "A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Id.*; *Enfield v. Kleppe*, 566 F.2d 1139, 1142 (10th Cir. 1977) (a conflict between regulation and statute "renders the regulation which is in conflict with it void and unenforceable").

Because agencies have no independent lawmaking authority, a court "must independently determine for itself whether the agency's interpretation of a statute is correct." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025). Courts "are not bound by the agency's interpretation." *Id.* (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024)). Rather, a "court's prior judicial construction of a statute trumps an agency construction." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

Despite these firmly established principles, the CFTC is attempting to override judicial interpretations of the CEA and compel regulated entities to violate

court orders. The Court should reject these efforts and conclude that neither set of the CFTC's recent regulatory actions provides a basis to alter the Court's reading of the CEA.

**1. Recent rulemaking.**

Plaintiffs first identify an "interim final rule" (IFR) that Plaintiffs claim would preserve traditional State authority over gambling. *Id.* at 8. But the IFR does nothing of the sort. The CFTC issued the IFR, which purports to carve out "gambling" from the CEA's scope, at the same time that it also issued a notice of proposed rule making (NPRM) that "purport[s] to clarify the definition of the term 'swap' to include 'sports-, politics-, cultural-, and weather- related' event contracts." *Ludlow Exch., LLC v. James*, 2026 WL 3408217, at *3–4 (S.D.N.Y. Nov. 10, 2026). Neither rule undermines this Court's previous ruling.

As an initial matter, the IFR and NPRM are inconsistent with how courts across the country have interpreted the CEA's definition of the term "swap." Worse still, as one federal court has already concluded in rejecting arguments identical to the CFTC's, the two rules don't even agree with each other. *Id.* (IFR and NPRM provide "contradictory statements" as to meaning of swap). The IFR recognizes the CFTC's "longstanding position that casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction." *Id.* In contrast, the NPRM would sweep sports betting into the scope of the CEA despite the CFTC's failure to identify any *statutory* basis for the CFTC's purported distinctions. *Id.* at *11

(analyzing the CEA's definition of swap and concluding that "there is no qualitative difference" between traditional sports betting and "event contracts").

The Court need not give any deference to this recent contradictory rulemaking, especially where the CFTC's "sudden change in its longstanding position that sports wagering activity is the province of states appears calculated to influence the outcome of the ongoing litigation on this very issue." *Id.* at *12.

**2. Guidance.**

Plaintiffs also identify non-binding "guidance" the CFTC recently issued that interprets its impartial-access regulation as requiring DCMs to offer event contracts nationwide. Dkt. 23 at 8. Through this "guidance," the CFTC attempts an end-run around federal courts, including this Court, that have rejected this very interpretation. *See* Dkt. 19 at 20. This non-binding "guidance" should be given even less weight than the IFR and NPRM. Even in a pre-*Loper Bright* world, "[i]nterpretive rules 'd[id] not have the force and effect of law and [we]re not accorded that weight in the adjudicatory process.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). So the CFTC's guidance is "not binding on courts," "on parties," "or the agency itself." *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1262 (10th Cir. 2018). And, because it is inconsistent with court decisions across the country, it cannot even be applied uniformly nationwide.

The CFTC's proposed guidance is also inconsistent with federal law. Through its guidance, the CFTC is attempting to coerce private parties to violate State gambling (and possibly other) laws. But the conduct the CFTC is attempting to coerce is also illegal under *federal law*. *See* 18 U.S.C. § 1955 (criminalizing the

operation of a business within a State in a manner that violates State gambling laws). The CFTC cannot compel anyone to violate federal law. *Butz v. Economou*, 438 U.S. 478, 505–06 (1978) ("All the officers of the government . . . are creatures of the law, and are bound to obey it." (citation omitted))

The "guidance" is also in tension with the text of the CEA. Nothing in the CEA authorizes the CFTC to compel private parties to enter specific markets or offer specific products. Instead, it provides a regulatory framework for *willing* market participants. Nevertheless, if regulated parties choose to avoid breaking State gambling laws by geofencing, the CFTC threatens to revoke their DCM registration. This creates an impossible conflict *with the CEA*. As noted in the State's opposition, Section 12a of the CEA authorizes the CFTC to revoke the registration of market actors where those actors have been convicted of various State crimes—including gambling crimes. 7 U.S.C. § 12a(2). Not only does this provision assume that States enjoy ongoing jurisdiction to prosecute gambling crimes against registered market participants like Kalshi, but it also authorizes the CFTC to revoke a DCM's registration for engaging in the very conduct the "guidance" seeks to compel.

Finally, even if the "guidance" were not inconsistent with federal law and the CEA, it would nevertheless constitute an unconstitutional extension of the CEA's provisions. Plaintiffs argue that it is necessary to compel DCMs to participate in all States in order to achieve the CEA's goals. Dkt. 23 at 8. But "[t]he Framers gave Congress the power to regulate commerce, not to compel it." *Nat'l Fed'n of Indep.*

*Bus. v. Sebelius*, 567 U.S. 519, 555 (2012). Plaintiffs' "theory here would effectively override that limitation by establishing that individuals may be [compelled to act] under the Commerce Clause whenever enough of them are not doing something the Government would have them do." *Id.* at 553. If DCMs do not wish to offer event contracts in Utah, the CFTC cannot compel them to do so.

Accordingly, the CFTC's recent regulatory actions do nothing to alter the basis for this Court's ruling in the *Kalshi* case.

**C. Utah's Enforcement Actions**

Finally, Plaintiffs argue that the "State's enforcement action and criminal prosecutions can leave no doubt 'that compliance with both federal and state law is impossible' and, at a minimum, that Utah's enforcement action 'stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of the CEA.'" Dkt. 23 at 8 (*quoting KalshiEx*, 2026 WL 2241564, at *12-13). But the prospect of the State moving forward with efforts to enforce its gambling laws was squarely in front of the Court when it issued its ruling in *Kalshi*. Indeed, an injunction stopping such enforcement was the only purpose of KalshiEx's lawsuit, as well as KalshiEx's motion to the Tenth Circuit for an injunction pending appeal. This Court rejected Kalshi's lawsuit (and obstacle and impossibility arguments), and the Tenth Circuit rejected Kalshi's motion. Accordingly, Utah's enforcement of its gambling laws does not alter the landscaping underlying this Court's previous ruling.

## Conclusion

For the foregoing reasons, the Court should deny the Motion for Preliminary Injunction and Temporary Restraining Order.

Respectfully submitted,

Derek Brown
Utah Attorney General

*/s/ Joshua Cutler*
Joshua Cutler
Assistant Solicitor General
Stanford Purser
Solicitor General
Mark Gillespie
Assistant Solicitor General

*Counsel for Defendants*

**Certificate of Compliance**

I, Joshua B. Cutler, certify that this **SURREPLY IN OPPOSITION TO PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** contains 3,087 words and does not exceed any page or word limitations established by any applicable procedural rule or order of the Court.

*/s/ Joshua B. Cutler*
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*

## Certificate of Service

I hereby certify that on November 18, 2026, I caused a true and correct copy of the foregoing **SURREPLY IN OPPOSITION TO PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** to be filed using the Court's electronic filing system, which effectuated service of such filing upon all counsel who have entered an appearance.

*/s/ Joshua Cutler*
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*